UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                      :

T. PATRICK FREYDL,                  :
              Plaintiff,    :
                      :             09 Civ. 7196 (JPO)
                      :

            -v-           :       MEMORANDUM AND
                      :              ORDER
JOHN C. MERINGOLO et al.,    :
             Defendants.  :
                      :
---------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

     *Pro se* Plaintiff Patrick T. Freydl brings this action for breach of contract and quasi-

contract, pursuant to New York State law, against Defendants John C. Meringolo and Meringolo

& Associates, P.C.  Defendant Meringolo & Associates, P.C. asserts a counterclaim against

Plaintiff for unjust enrichment.  Defendants have moved for summary judgment, and Plaintiff

has moved for judgment on the pleadings with respect to the counterclaims.  For the reasons that

follow, both motions are denied, with certain exceptions.

I.     **Background**

    A.    **Factual Background**[1]

     This case concerns the disintegration of a professional and personal relationship.  John C.

Meringolo ("Meringolo") is an attorney in New York State, and his law firm, Meringolo &

Associates, P.C. ("M&A") is a duly authorized professional corporation organized under the

laws of the State of New York and engaged in the practice of law.  Patrick T. Freydl ("Freydl")

---

[1] The following facts are taken from the parties' Local Rule 56.1 statements and other
submissions in connection with the motion for summary judgment.  They are undisputed unless
otherwise noted.

is a disbarred California attorney, suspended Michigan attorney, and the sole owner of the California corporation Freydl & Associates ("F&A").[2]

Freydl and Meringolo first met in 2004.  In 2005, Freydl began to assist Meringolo in Meringolo's legal work; their association was "something in between" a professional relationship and a friendship.  In his Amended Complaint, Freydl states that he offered some services "voluntarily and gratuitously," while he received compensation for others.[3]  Though Freydl was undisputedly compensated by M&A to some extent, the method by which this compensation was determined is hotly contested by the parties.  Whereas Defendants assert that Freydl's compensation was determined "solely" by Meringolo as CEO of M&A, Freydl asserts that he and Meringolo regularly communicated concerning the appropriate compensation for Freydl associated with a given matter.[4]

The record reflects that for some time Freydl served as a friend and mentor-like figure for Meringolo, aiding Meringolo by preparing documents for various actions.  Their professional

---

[2] F&A, a third party defendant named in Defendants' counterclaim, has defaulted in this lawsuit, never entering an appearance.  (*See* Clerk's Cert. of Default, Dkt. No. 132.)

[3] Freydl disputes that he offered his services voluntarily and gratuitously at various times, but he alleges as such in his Verified Complaint.  (*See* Verified Complaint, Dkt. No. 1 ("Compl."), at ¶ 10.)

[4] As evidence of a typical fee arrangement between Freydl and Meringolo, Freydl cites a January 2008 email in which Meringolo wrote to Freydl:

> I was thinking that if the trial was 2 to 3 weeks, $30,000.00 plus
> expenses, in my mind was [sic] can make $4,500 per week and pay
> a paralegal $1,000.00 per week what do you think, I think that the
> trial is going to be scheduled for the summer.

(Plaintiff Patrick Freydl's Memorandum of Law in Opposition, Dkt. No. 164 ("Pl.'s Opp."), Ex. 5.)

relationship appears to have been closely tied to their personal friendship.[5]  The two worked together over the course of several years, though at no point did Freydl and Meringolo have a written agreement as to the terms of Freydl's compensation or the status of their professional relationship.  Likewise, M&A and Freydl never entered into a written contract governing Freydl's work for the corporation.

On or about March 30, 2009, the relationship between Freydl and Meringolo broke down. Freydl asserts that around that time, he repeatedly attempted to get in touch with Meringolo concerning the status of several cases, offering his services, but was rebuffed by Meringolo. (Pl.'s Opp. at 13.)  On April 19, 2009, Freydl sent an email to Meringolo in which he questioned the lack of communication between the two in the preceding weeks.[6]  Meringolo responded that the two "[were] always friends," but that he had various projects to handle with pending matters, and he would email Freydl when M&A had finished with certain submissions.  (*Id.* at 14; *id.*, Ex. 18.)  Freydl replied to this email by requesting a copy of the reply in one of the matters at issue, which Meringolo never sent to him.  (*Id.* at 14.)

---

[5] *See, e.g.*, *id.*, Ex. 10 (an email dated June 15, 2008 in which Meringolo refers to Freydl as a "friend, brother, and mentor"); *id.*, Ex. 12 (a text message to Freydl in which Meringolo reports on the status of a matter that he and Freydl were working on at the time and states "love u").

[6] The text of this email is as follows:

> Our bond has always allowed us to talk straight to each other, so I would like to know where things are at with us.  I haven't heard from you in nearly three weeks, so tell me: are we suddenly no longer friends, are we no longer working on things together, are we, for some irreconcilable reason no longer a part of each other's lives anymore . . . because that was what we have been, a part of each other's lives.  If that is truly the way it is, tell me, then I will know what I am dealing with.  My best to everyone. . . .

(*Id.*, Ex. 17.)

On May 4, 2009, Freydl sent an email to Meringolo asserting that he was owed $4,500.00 for work done on the so-called "*Lucente* Matter." (Meringolo Memorandum in Support of Motion for Summary Judgment, Dkt. No. 146 ("Def.'s Mem."), Ex. NN.) Additionally, in that same email, Freydl stated: "if you collected anything on E-Z Media,[7] I would like to get paid for my work on that account. I was to get $7,500.00 on the $20,000, or whatever the proration is." (*Id.*) The parties dispute whether Freydl had previously complained about the amount of any check that he, or F&A, received from M&A, with Meringolo asserting that the May 4 email was the first instance of such a complaint. However, the parties agree that prior to the May 4 email, Freydl had never sent a written request to be paid.

Freydl's contract claims derive from work performed on four matters for M&A: the *Galasso*, *Brooks*, *Lucente*, and *Cuomo* matters. With respect to each of these claims, Freydl kept no record of his hours. For the *Galasso* matter, which occurred in 2007 and 2008, Plaintiff claims to be owed $12,000.00. (Def.'s Mem., Ex. QQ.) However, there is a dispute as to whether Freydl was partially compensated for the *Galasso* matter. For the *Brooks* matter, which began in December 2008, Freydl claims that he was to receive $112,500.00, pursuant to a "deal" between himself and M&A. With respect to *Brooks*, Freydl was to assist M&A in completing the pretrial work for the case. This trial began on January 25, 2010. (*Id.*, Ex. LL.) Freydl was paid $68,250.00 for his work on *Brooks*. In his Complaint, Freydl alleges that he was owed $150,000.00 for the *Brooks* matter (Compl. at ¶ 59), but now claims he is owed only $44,750.00 for this matter. (*See* Def.'s Mem., Ex. QQ.) With respect to *Lucente*, Freydl's understanding was that he would receive $20,000.00. In the aforementioned May 4 email, Freydl stated that he

---

[7] This is a reference to the *Cuomo* matter, discussed *infra*.

was owed $4,500.00 for *Lucente* (Def.'s Mem., Ex. NN);[8] in his Complaint, this amount shifted to $150,000.00 (*see* Compl. at ¶ 59); and later in his letter, dated April 17, 2012, Freydl claimed to be owed $15,500.00 for the matter. (Def.'s Mem., Ex. QQ.)  In any event, it is agreed that Freydl was paid $4,500.00 for the *Lucente* matter.  For the *Cuomo* matter, Freydl understood that he would receive $20,000.00 for pretrial work.  In the May 4 email, Freydl claimed to be owed $7,500.00 for this matter.  (Def.'s Mem., Ex. NN.)  Later, in his Complaint, he asserted that he was owed $150,000.00 for *Cuomo* (Compl. at ¶ 59); but on April 17, 2012 he stated that he was owed $20,000.00 for the matter.  (Def.'s Mem., Ex. QQ.)  The parties dispute whether Freydl was partially compensated on the *Cuomo* matter.

Freydl's quantum meruit claims are premised on work performed for the *Romano*, *Gluck*, *Graffagnino*, and *Fernich* matters.  These claims all relate to assistance that Freydl allegedly rendered to M&A in 2008.  For each of these claims, Freydl reconstructed time records (Def.'s Mem., Exs. UU-XX), and Freydl possesses no time records for these claims other than these reconstructions.  With respect to *Romano*, Freydl's records state that he reviewed documents, researched law on foreclosure, and wrote a memorandum.  Meringolo asserts that he paid Freydl $1,250.00 for the *Romano* matter (*id.*, Ex. W), a fact which Freydl disputes.  (Pl.'s Opp. at 33.)  With respect to the *Gluck* matter, Freydl claims that he performed a total of 18 hours of work between February 22, 2008 and July 29, 2008.  (*Id.*, Ex. WW.)  For the work performed in *Gluck*, Freydl asserts that he is owed an hourly rate of $500.00, and believes that he is owed as much as Meringolo for work performed.  As for *Graffagnino*, Freydl performed work on an opposition to a motion to stay the case.  While Meringolo asserts that he paid Freydl $1,000 for

---

[8] Freydl disputes that he ever made this demand, but this assertion is belied by the text of the email that he undisputedly sent to Meringolo on May 4, 2009.  (*See* Def.'s Mem., Ex. NN.)

this matter (*id.*, Ex. U), Freydl disputes that he was paid for work performed on *Graffagnino*. Freydl asserts that he worked 14 hours in June 2008 on this matter.  (*Id.*, Ex. VV.)  Finally, regarding *Fernich*, Freydl worked on the matter from January 2008 through March 5, 2008. Again, as with the other matters from which his quantum meruit claims derive, Freydl kept no contemporaneous records of the hours worked on this case.  Freydl's reconstructed records indicate that he worked approximately 35 hours on the *Fernich* matter.  (*Id.*, Ex. UU.)  With respect to this matter, Meringolo claims that he paid Freydl $500.00 for work on an answer to a civil complaint.  (*Id.*, Ex. T.)  However, Freydl disputes this fact, asserting that the check dated February 9, 2008—represented by Meringolo as payment for work associated with the *Fernich* matter—could not have been for work on an answer to a civil complaint, as the Meringolo Defendants had not been sued by *Fernich* until February 19, 2008.  (Pl.'s Opp., Ex. 7.)

      **B.**    **Procedural History**

      This case, which was commenced in August 2009, has a long and convoluted procedural history, encompassing years of discovery, motion practice, and conferences before this Court. Accordingly, addressed here are the most directly relevant aspects of the case's procedural history.  Freydl filed his Complaint in this action against Defendants on August 14, 2009.  This Complaint asserted seven counts: Common Law Fraud ("Count One"); Conspiracy to Commit Common Law Fraud ("Count Two"); Breach of Contract ("Count Three"); Breach of Covenant of Good Faith and Fair Dealing ("Count Four"); Interference with Contract ("Count Five"); Constructive Contract ("Count Six"); and Quantum Meruit ("Count Seven").  In October 2009, Defendants moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  In an opinion and order dated August 2, 2010, Judge Barbara S. Jones granted Defendants' 12(b)(6) motion in part and denied the 12(b)(1) motion with leave to

replead.  (*See* Opinion and Order, Dkt. No. 19.)  Judge Jones dismissed Counts One, Two, and

Five, leaving Counts Three, Four, Six, and Seven—the four counts that are subject of the instant

motion for summary judgment.

In their Answer, filed in January 2011, Defendants counterclaimed against Freydl.  (Dkt.

No. 41.)  This Counterclaim was amended twice, with Defendants filing the operative Amended

Counterclaim in April 2012.  (Amended Counterclaim, Dkt. No. 134.)  Defendants' counterclaim

alleges unjust enrichment on the part of Freydl and F&A.  (*Id.* at ¶¶ 50-52.)

On July 23, 2012, Defendants filed a motion for summary judgment, seeking dismissal of

all of Freydl's remaining claims.  (Defendants' Motion for Summary Judgment, Dkt. No. 145.)

That same day, Freydl filed a motion for judgment on the pleadings with respect to Defendants'

counterclaim.  (Motion for Judgment on the Pleadings, Dkt. No. 152.)  Defendants opposed this

motion on August 31, 2012 (Reply Memorandum in Opposition, Dkt. No. 157 ("Def.'s Opp.").)

In September 2012, Freydl both opposed Defendants' summary judgment motion (*see* Dkt. Nos.

164-66), and replied to Defendants' opposition to the motion for judgment on the pleadings

(Plaintiff/Counterclaim Defendant's Reply Brief, Dkt. No. 163 ("Pl.'s Rep.").)  Also in

September, Defendants replied to Freydl's summary judgment opposition.  (Reply to Response

to Motion, Dkt. No. 160 ("Def.'s Rep.").)

C.     **Legal Standard**

1.     **Summary Judgment**

"Pursuant to Federal Rule of Civil Procedure 56, summary judgment 'is appropriate when

the evidence shows that there is no genuine issue of material fact and that the moving party is

entitled to a judgment as a matter of law.'"  *Borghese Trademarks, Inc. v. Borghese*, No. 10 Civ.

5552, 2013 WL 143807, at *6 (S.D.N.Y. Jan. 14, 2013) (citation omitted).  While all facts are

taken in the light most favorable to the non-movant, *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011), in response to the movant's pleading, the non-movant must nevertheless introduce "specific facts showing that there is a genuine issue for trial." *Ricci v. Stefano*, 557 U.S. 557, 586 (2009). Mere conclusions will not suffice. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). An issue of fact constitutes a "genuine" one if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Initially, the movant must provide evidence on each material element of his claim or defense illustrating his entitlement to relief. *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The motion will prevail only "when no reasonable trier of fact could find in favor of the nonmoving party." *White v. ABCO Engineering Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

### 2.        Judgment on the Pleadings

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (citation omitted). "On a Rule 12(c) motion, the Court must accept as true the non-movant's allegations and draw all reasonable inferences in the nonmovant's favor." *Admiral Ins. Co. v. Adges*, No. 11 Civ. 8289, 2012 WL 2426541, at *1 (S.D.N.Y. June 27, 2012) (citations omitted). When reviewing a Rule 12(c) motion, a Court may review only the pleadings, any documents that are attached thereto, incorporated by reference, or

"integral" to the allegations, and any facts of which a Court may take judicial notice.  *See, e.g.*,

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## II.    Discussion

### A.    Motion for Summary Judgment

Defendants move for summary judgment on Counts Three, Four, Six, and Seven,

contending that discovery has failed to reveal any genuine issue of material fact with respect to

Freydl's remaining claims.

#### 1.    Meringolo as Defendant

First, the Court agrees with Defendants that summary judgment must be granted in favor

of John C. Meringolo individually.  (*See* Def.'s Mem. at 34-35.)  All payments made to Freydl,

and any agreements between Freydl and Meringolo, were on behalf of M&A and effected in

Meringolo's capacity as chief executive officer of M&A.  It is M&A, not Meringolo himself,

which issued checks to Freydl for his work (*see, e.g.*, *id.*, Exs. O-Z), and Freydl has repeatedly

testified that he performed work for M&A, not for Meringolo in his personal capacity.  (*See, e.g.*,

*id.*, JJ at 82:9-12; 86:2-4.)  Every check issued to Freydl, or F&A, by Defendants came from

M&A's corporate bank account, rather than from Meringolo's personal account, and the fact that

Meringolo is the sole shareholder and CEO of M&A is not alone sufficient to pierce the

corporate veil and attach personal liability to contracts made on behalf of a professional

corporation.[9]  Moreover, while Freydl asserts that Meringolo personally guaranteed all funds

---

[9] Freydl contends that his claims against Meringolo do not rest on a piercing of the corporate veil theory and therefore this is not an issue for the Court's determination.  (Pl.'s Opp. at 49.) However, in order for a party to assert personal liability against an individual for actions made in their professional capacity as an officer of a corporation or LLP, that party must pierce the corporate veil by showing complete dominion and control that was used to perpetrate fraud,

owed on Freydl's work for M&A (Pl.'s Opp. at 48-49; Affidavit of T. Patrick Freydl, Dkt. No. 166 ("Pl.'s Aff."), at ¶ 4), this contention is conclusory.  There is no evidence in the record to suggest that monies owing to Freydl would come from Meringolo's personal account, rather than that of the law firm.  Because Freydl himself described his legal work as services rendered for M&A, the entity, rather than those performed for Meringolo personally, and because record evidence reveals that Freydl was paid from a corporate account, all claims against Meringolo personally must be dismissed.

### 2.        Contract Claims (Counts Three and Four)

As noted above, Freydl's contract claims derive from work performed for M&A on four matters: *Galasso*,[10] *Brooks*, *Lucente*, and *Cuomo*.  Freydl asserts that Defendants breached their contractual obligation to pay him for his work on these matters.  Freydl also alleges a breach of the covenant of good faith and fair dealing.[11]  In response to Freydl's contract claims, Defendants assert, *inter alia*, that Freydl has failed to point to evidence in the record establishing the existence of an enforceable agreement.  While the parties clearly dispute the existence of any contract or the amount, if any, owing to Freydl on each of these matters, this dispute alone is

---

*MAG Portfolio Consult, Gmbh v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001), *or* provide evidence that there was a personal guarantee with respect to monies potentially owed.

[10] Freydl fails to allege the existence of a contract with respect to *Galasso* in his Complaint.  (*See* Compl., at ¶¶ 10(c), 54-63.)  Accordingly, he has failed to state a breach of contract claim with respect to *Galasso*.

[11] "[I]n all contracts there is an implied covenant of fair dealing and good faith."  *River Bank of America v. Daniel Equities Corp.*, 624 N.Y.S.2d 287, 289, 213 A.D.2d 929 (3d Dep't 1995).  However, as a claim for breach of the covenant of good faith and fair dealing is necessarily a claim for breach of the underlying contract, it "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract."  *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) (citation omitted).

insufficient to defeat summary judgment.  Instead, the record must reflect a genuine issue of

material fact with respect to the existence of a contract.

The parties agree that no arrangement between them was ever reduced to writing.  Thus,

any enforceable contract would have been oral in nature.  Oral arrangements can indeed give rise

to enforceable agreements, though "[a] plaintiff faces a heavier burden when trying to prove an

alleged oral contract."  *Cleveland Wrecking Co. v. Hercules Const. Corp.*, 23 F. Supp. 2d 287,

293 (E.D.N.Y. 1998).  More generally, to establish a breach of contract claim in New York, a

party must show:

> (1) that an agreement existed between it and the defendant, (2)
> what the respective obligations of the parties were, (3) that the
> plaintiff performed its obligations under the agreement, (4) that the
> defendant breached the agreement by failing to perform its
> obligations, and (5) that the plaintiff suffered damages as a result
> of the breach.

*Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337, 341 (S.D.N.Y. 1992).

"Under New York law, an agreement is enforceable if a meeting of the minds has occurred as to

the contract's material terms."  *Michael Coppel Promotions Pty. Ltd. v. Bolton*, 982 F. Supp.

950, 954 (S.D.N.Y. 1997) (quotations and footnote omitted).  Thus, where the terms of an

"agreement are so vague and indefinite that there is . . . no means by which such terms may be

made certain, then there is no enforceable contract."  *Candid Prods., Inc. v. Int'l Skating Union*,

530 F. Supp. 1330, 1333-34 (S.D.N.Y. 1982) (footnotes omitted).  And while "[c]ourts are loath

to deny enforcement of agreements on indefiniteness grounds," *Cleveland*, 23 F. Supp. 2d at 293,

"the parties must not only believe they have made a contract, they must also have expressed their

intent in a manner susceptible of judicial interpretation."  *Brookhaven Housing Coalition v.*

*Solomon*, 583 F.2d 584, 593 (2d Cir. 1978); *accord Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d

495, 506 (S.D.N.Y. 2001) ("Few principles are better settled in the law of contracts than the

requirement of definiteness.  If an agreement is not reasonably certain in its material terms, there

can be no legally enforceable contract.").

"The consideration to be paid under a contract is a material term."  *GEM Advisors, Inc. v.

Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 326 (S.D.N.Y. 2009); *accord  Major League

Baseball Props., Inc. v. Opening Day Prod., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005)

("Price or compensation are material terms in a contract requiring definiteness.").  However, as

Judge Sullivan has explained, "[t]he failure to fix a sum certain, however, is not necessarily fatal

to a contract."  *GEM Advisors*, 667 F. Supp. 2d at 326.[12]

Here, Defendants contend that each of Freydl's contract claims fails as a result of

indefiniteness.  Defendants' argument is premised on Freydl's "evolving" theories of

compensation.  Admittedly, at various points both prior to and during this litigation, Freydl has

claimed that he is owed varying amounts for each of his four contract claims.  However, Freydl

nevertheless has continuously contended that he was promised, and is owed, a sum certain with

respect to each of the matters in question.

---

[12] In *GEM*, Judge Sullivan notes that the New York Court of Appeals has held:

> [A] price term is not necessarily indefinite because the agreement
> fails to specify a dollar figure, or leaves fixing the amount for the
> future, or contains no computational formula. Where at the time of
> agreement the parties have manifested their intent to be bound, a
> price term may be sufficiently definite if the amount can be
> determined objectively without the need for new expressions by
> the parties; a method for reducing uncertainty to certainty might,
> for example, be found within the agreement or ascertained by
> reference to an extrinsic event, commercial practice or trade usage.
> *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d
> 475, 483, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989).

Regarding the *Brooks* matter, all parties agree that Freydl was compensated $68,250.00 for his work.  However, Freydl contends that pursuant to an enforceable agreement between Freydl and M&A, he was to receive $112,500.00, as a flat sum for aiding in the pretrial work for *Brooks*.  (Pl.'s Opp. at 11.)  Thus, Freydl asserts that he is still owed the remaining $44,250.00[13] owing on the agreed-upon fee of $112,500.00.  In response, Defendants assert that Freydl's evolving monetary claims in *Brooks* highlight the indefiniteness and thus, unenforceability, of the agreement relating to the *Brooks* matter.  Indeed, Freydl initially claimed in his Complaint that he was owed $150,000.00 for *Brooks*, a number that has now been reduced to $44,250.00.  However, taking the facts in the light most favorable to the non-movant, Freydl and M&A had an agreement that Freydl was to be paid a sum certain of $112,500.00 for work performed on the *Brooks* matter, and to date, Freydl has been paid only a portion—approximately $68,000.00—of that sum.  Freydl's confusion over the amount owed to him for *Brooks* goes to his credibility, not to the materiality of the issues of fact that remain.

Additionally, the divergent narratives concerning both the duration and the cost of the work performed on the *Brooks* matter are classic factual questions, unsuitable for determination as a matter of law.  For example, while Defendants assert that Freydl abandoned work on the *Brooks* matter, ceasing to perform pretrial obligations in March 2009, though the trial began in January 2010 (Def.'s Mem. at 19), Freydl claims that his contract with M&A extended only through March 2009.  (*Id.*, Ex. JJ, 127:20-128:10.)  Moreover, while Defendants disavow the

---

[13] The sum that Freydl alleges he is owed on the *Brooks* matter is not entirely clear, as he admits to having been paid $68,250.00, but at once asserts that the flat fee was to be $112,500.00 and that he is owned $44,750.00.  (*Compare* Ex. QQ at 2, *with* Ex. JJ at 111-121, 121, 125.)  Since $44,250.00, rather than $44,750.00, is the difference between the purported flat fee, and the conceded payment of $68,250.00, the Court uses the $44,250.00 number in describing Freydl's claim with respect to the *Brooks* matter.

existence of an enforceable agreement, they nevertheless admit to paying Freydl over $68,000.00 for work performed on the matter, claiming that all compensation paid to Freydl from M&A was "determined solely by Meringolo as CEO of M&A." (Defendants' 56.1 Statement, Dkt. No. 147 ("Def.'s 56.1"), at ¶ 41.) However, this assertion is in dispute, as Freydl contends that he and Meringolo worked in concert to determine the appropriate fee for each particular matter.[14] (Plaintiff's 56.1 Statement, Dkt. No. 165 ("Pl.'s 56.1"), at ¶ 41; Pl.'s Aff. at ¶¶ 26, 46, 52.)

With respect to *Lucente*, Freydl contends that he performed "all the itemized work involving the pretrial motions." (Pl.'s Opp. at 29.) He also points to evidence in the record suggesting that he planned on engaging in further work on *Lucente*, but never did so due to the disintegration of the relationship between the parties. (*See* Pl.'s Opp., Exs. 18, 19.) All parties agree that Freydl was paid $4,500.00 on the matter, suggesting that there was some species of agreement pursuant to which M&A, via Meringolo, agreed to pay Freydl for his services. However, again, the parties dispute the amount owing to Freydl. Admittedly, Freydl's claims for compensation in this matter have varied over time, ranging from $4,500.00 (Def.'s Mem., Ex. NN), to $150,000.00 (Compl., ¶¶ 54-63), to $15,500.00 (Def.'s Mem., Ex. QQ.) But the fact that the amount owing to Freydl is disputed, with Meringolo contending that Freydl is owed nothing more than the $4,500.00 he was already paid, does not necessarily indicate that as a matter of law no enforceable agreement with respect to compensation ever existed. Additionally, Defendants assert that M&A was paid only $15,000.00 for the *Lucente* matter from the client, rendering a

---

[14] As evidence of the role Freydl played in determining his own rate of compensation, Freydl submitted an email exchange between Freydl and Meringolo relating to work performed on the so-called *Mugerman* matter. (*See* Pl.'s Opp. at Ex. 5.) While Defendants are correct in their assertion that this exchange is not evidence of a binding agreement between the parties, it does nevertheless present an alternative to Defendants' contention by suggesting that Freydl's compensation was at least a subject of discussion among the parties, rather than within the sole purview and discretion of Meringolo, in his capacity as CEO of M&A.

flat fee of $15,500.00 for Freydl's services implausible.  However, Defendants present as
evidence of this fee Meringolo's own affirmation, coupled with a single unmarked check, which,
though given under penalty of perjury, is not conclusive at this stage.  (*Id.*, Ex. C.)  The trier of
fact will be free to examine the plausibility of Freydl's contract claim, especially in light of the
contradictions in the record.  However, the court is not obliged at this stage to disregard Freydl's
record evidence that he and M&A made a practice of negotiating appropriate, flat fees together
for each particular matter at hand, suggesting that these fees reflected more than a single,
discretionary choice by Meringolo in the absence of an enforceable arrangement.  Moreover, in
May 2009 Meringolo admitted to owing Freydl some amount of money on the *Lucente* matter,
suggesting that there may have been some species of agreement at some time. [15]  (Pl.'s Opp., Ex.
34.)

Finally, regarding the *Cuomo* matter, Freydl asserts that he is owed $20,000.00.  (Def.'s
Mem., Ex. QQ.)  Again, Defendants contend that such a sum is implausible given that (1) Freydl
originally claimed to be owed $7,500.00 for the matter (*id.*, Ex. NN); and (2) M&A was paid
only $20,000 for the matter, rendering it illogical that Freydl would have received a fee equal to
that given to the firm itself.  Nevertheless, the record reflects various exchanges among the
parties regarding work to be performed and the appropriate compensation for such services.
While Freydl's sum certain with respect to each of his contract claims has certainly shifted, as
discussed, this fact alone does not reflect that there was never a meeting of the minds between
the parties.  And given the nature of the correspondence and relationship between Freydl and
Meringolo, it seems that they frequently came to some sort of understanding regarding the

---

[15] The email message from Meringolo reads, in pertinent part, as follows: "We have not been
paid on the doc [referring to Dr. Richard Lucente] so I cannot pay you, hopefully we do get paid
and when we do I will deduct your portion of the share for the 5 reply brief and trial prep."

matters for which M&A was retained and the services that were to be rendered for such matters. (*See, e.g.*, Pl.'s Opp., Ex. 34 (quoting the May 2009 email from Meringolo where Meringolo seemingly admits to owing Freydl some remaining money on the *Lucente* matter).)

Whether such understandings constituted enforceable contracts, and whether Freydl can carry his burden and prove definiteness or damages, are matters that depend almost entirely on weighing two, conflicting accounts of the work performed and services rendered for these three matters.  Moreover, while no reasonable jury might find that Freydl would be paid the same amount that M&A earned for work on a given matter, a reasonable jury, in light of the evidence, including a pre-litigation email from Freydl (Def.'s Mem., Ex. NN), could indeed credit Freydl's testimony that he is owed $7,500.00 for the *Cuomo* matter.  For the Court to selectively choose, from Freydl's evolving theories of compensation, the one amount that renders his contract claim implausible would fail to construe the evidence in his favor, as required by law.

In sum, to hold as a matter of law that the parties' inconsistent accounts of the *Brooks*, *Lucente*, and *Cuomo* matters reflect that an enforceable agreement among them never existed is a bridge too far.  Put another way, given that the parties disagree as to the amount owing, core nature, and material terms of the alleged contracts, the weighing of their respective accounts must be left to the trier of fact.  *See Napoli v. First Unum Life Ins. Co.*, 78 Fed. App'x. 787, 789 (2d Cir. 2003). ("Such a credibility determination is appropriate at a trial, but it exceeds the scope of a judge's authority in considering a summary judgment motion. . . . Accordingly, because genuine issues of material fact exist in this case and its resolution depends, in part, on credibility determinations, the District Court improperly granted summary judgment . . . . ").

In response to Freydl's contract claims, Defendants assert Statute of Frauds[16] and illegality as defenses. With respect to statute of frauds, however, it is clear that Freydl's obligations on the *Brooks*, *Lucente*, and *Cuomo* matters were conceivably performable within one year, thus eliminating statute of frauds as a valid defense. *See Day v. Meyer*, No. 99 Civ. 10708 (HB), 2000 WL 1357499, at *3 (S.D.N.Y. Sept. 19, 2000) ("Section 5-701(a)(1) has been read narrowly so as to bar oral agreements when there is no 'possibility in fact and law of full performance within one year.'" (quoting *Ohanian v. Avis Rent-a-Car System, Inc.*, 779 F.2d 101, 106 (2d Cir. 1985)).

With respect to illegality, Defendants note that various aspects of the record suggest that any agreement among the parties involved some species of an illegal fee-splitting arrangement between a lawyer (Meringolo) and a non-lawyer (Freydl).[17] Defendants are correct that New

---

[16] N.Y. Gen. Obligations Law § 5-701(a)(1) states, in pertinent part:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking . . . [b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime.

[17] In a telephone conference with the Court on April 18, 2012, in describing the monies allegedly owed to him by M&A, Freydl stated as follows:

> My argument is we always worked on a flat-fee basis; that this was an evolving relationship . . . . In each instance, the formulation of what I got was a function of what they received. And if you think about it, how could it make any business sense otherwise? It had to be tied to those numbers.

(Def.'s Mem, Ex. HH, 26:21-27:1.) Additionally, in that same conference, Freydl appeared to describe some form of a fee-sharing arrangement, based on a defined percentage:

> All of the deals that I worked on for defendants, with one exception, a case very early on, which was a contingent case but still fell within the formulation in which we achieved the money, we split it essentially 45—10 percent of the override for costs and

York law prohibits the division of fees between a lawyer and a non-lawyer, meaning that a non-lawyer must receive a fixed salary, rather than a profit percentage in order for such an agreement to be valid.  N.Y. Judiciary Law § 491(1) (McKinney) ("It shall be unlawful for any person, partnership, corporation, or association to divide with or receive from, or to agree to divide with or receive from, any attorney-at-law or group of attorneys-at-law, whether practicing in this state or elsewhere, either before or after action brought, any portion of any fee or compensation, charged or received by such attorney-at-law . . . ."); *accord Van Bergh v. Simons*, 286 F.2d 325, 326 (2d Cir. 1961) ("The alleged contract providing for 25% of the attorney's fee in exchange for procuring the client was void as it was in violation of the laws of New York and contrary to its expressed public policy; such a contract will not be enforced.").

It is axiomatic that courts will generally refuse to enforce illegal contracts, such as those providing for fee splitting between lawyers and non-lawyers, *Stone v. Freeman*, 298 N.Y. 268, 271, 82 N.E.2d 571 (Ct. App. 1948) ("It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose."); *accord Bonilla v. Rotter*, 36 A.D.3d 534, 535, 829 N.Y.S.2d 52 (1st Dep't 2007) ("The agreement alleged by plaintiff is one between a nonlawyer and attorneys to split legal fees which is proscribed by Judiciary Law § 491. Accordingly, the agreement is illegal and plaintiff is foreclosed from seeking the assistance of the courts in enforcing it.").  However, the record is unclear as to whether any arrangement

---

               split the balance 45/45 under—that's the way it worked out under agreement in the division of labor, when I did all the—you know, I did all the back office stuff and, where appropriate, Mr. Meringolo would go to court.

(*Id.* at Ex. HH, 22:8-16.)

between Freydl and M&A was indeed one based on a sharing of profits by percentage, rather than on a fixed basis.  While certain aspects of the record suggest the existence of fee splitting. *see, e.g.*, Def's Mem. at 21 (noting that Freydl's claim of $44,250.00 on the *Brooks* matter is seemingly derived from "subtracting the monies he concedes were paid from . . . $112,500.00," which constitutes 45% of the $250,000.00 fee that he believed M&A received for the matter), Freydl repeatedly asserted under oath that he was paid a "flat fee" for each matter upon which he bases his contract claims.  Moreover, M&A asserts that the fees were flat, and the subject of Meringolo's discretion.  The conflicting accounts among the parties as to the nature and extent of the putative contractual relationship at issue simply underscore the existence of genuine disputes of material fact that require determination at trial.

Accordingly, with respect to Freydl's contract claims for the *Brooks*, *Cuomo*, and *Lucente* matters, summary judgment is denied.

### 3.    Quasi-Contract Claims (Counts Six and Seven)

Freydl also asserts quasi-contract and *quantum meruit* claims with respect to his work on four matters: *Fernich*, *Graffagnino*,[18] *Gluck*, and *Romano*.  At his deposition on May 24, 2012, Freydl provided reconstructed timesheets purportedly reflecting the work performed on these matters, claiming that he is owed payment for approximately 35 hours on *Fernich*, 14 hours on *Graffagnino*, 18 hours on *Gluck*, and 11 hours on *Romano*.  (Def.'s Mem., Exs. UU-XX.) Defendants claim that these reconstructed timesheets are inadmissible at trial, unreliable, self-serving, and thus, fail to establish an issue of material fact as to Freydl's quasi-contract claims. Moreover, Defendants also assert that Freydl was already paid for each of the matters in

---

[18] The Court dismisses Freydl's claims associated with the *Graffagnino* matter, as he failed to assert any claim based on work performed for this matter in the Complaint.

question.  (*Id.*, Exs. T-W (checks from M&A to Freydl that were allegedly paid for each of the

matters in question.)

"In order to make out a cause of action in quantum meruit or quasi contract, a plaintiff

must establish (1) the performance of services in good faith; (2) the acceptance of those services

by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4)

the reasonable value of the services."  *Landcom, Inc. v. Galen-Lyons Joint Landfill Comm'n*, 259

A.D.2d 967, 968, 687 N.Y.S.2d 841 (4th Dep't 1999); *accord New Spectrum Realty Services,*

*Inc. v. Nature Co.*, 42 F.3d 773, 777 (2d Cir. 1994) ("When no agreement, express or implied,

governs the parties' behavior, a plaintiff may recover in quasi-contract against a defendant who

'received a benefit from the plaintiff's services under circumstances which, in justice, preclude

him from denying an obligation to pay for them.'" (quoting *Bradkin v. Leverton*, 26 N.Y.2d 192,

197, 257 N.E.2d 643 (1970)).

Defendants' evidentiary challenge to the reconstructed timesheets is well founded.

Nevertheless, the parties' divergent interpretations of the record highlight the inappropriateness

of summary judgment for resolution of Plaintiff's quasi-contract claims.  For example,

Defendants point to four checks that they allege constitute full payment for Plaintiff's work on

the four matters in question.  (*See* Def.'s Mem., Exs. U-X.)  Yet Freydl challenges Defendants'

assertion that the $500.00 check dated February 9, 2008 was for work "on an answer to a civil

complaint" in the *Fernich* matter.  (Pl.'s Opp. at 33; *see also* Def.'s Mem., Ex. T.)  Freydl notes

that the *Fernich* lawsuit was not filed until February 19, 2008; thus, "Plaintiff could not have

been paid to defend it, and for only $500.00, when the magnitude of the work could not be

determined since the allegations of *Fernich*'s claims did not exist until that date."  (Pl.'s Opp. at

33; *id.*, Ex. 7 (the *Fernich* complaint).)

20

With respect to the *Gluck* matter, Plaintiff claims the $500.00 check that Defendants

contend constitutes payment (Def.'s Mem., Ex. V) instead reflects the $500.00 referred to by

Meringolo in a May 4, 2009 email associated with a client named Ezagui.[19]  (Pl.'s Opp. at 33.)

Finally, regarding *Romano*, Freydl asserts that the $1,250.00 check Defendants present as

payment (Def.'s Mem., Ex. W), constitutes "partial payment" on two separate matters, the

*Shereshevsky* and *Wein Reis* matters occurring around the November 11, 2008 date of the check.

(Pl.'s Opp. at 33-34.)  Defendants contend that Freydl can do no more than point to his own, self-

serving affidavit, together with his unauthenticated timesheets, as evidence for his quasi-contract

claims.  However, with respect to each matter at issue, Freydl does point to record evidence

casting doubt on Defendants' contentions concerning what work corresponded to which checks.

And with no way to match up the checks with the matters to which Defendants assert they

correspond, this fact of payment constitutes an issue of material fact.

At bottom, Freydl asserts that he performed services in good faith on these matters, and

Defendants seem to agree that Freydl did perform services on these matters for M&A.

Moreover, those services were clearly accepted.  With respect to the expectation of payment, and

the reasonable value of Freydl's services, the parties disagree, and the record does not clearly

support one narrative over the other.  Whereas Freydl apparently will testify that the

---

[19] The email from Meringolo, to which Freydl refers, reads, in pertinent part:

> If you are so concerned about the money keep the money I gave
> you for Roboskin ($2,500.00) of which I did not get paid, I gave
> you for the hotel ($1,000.00) of which I was not obligated to do,,
> [sic] *the money I gave you for Ezagui ($500.00)* of which you did
> no work on,, [sic] the money I put your account [sic] when you
> couldn't afford to go to the movies. $150.00), the money I had to
> pay for the replys for the doctor and ang ($5,000.00).

(Pl.'s Opp., Ex. 34 (emphasis added).)

aforementioned checks do not represent payment for the matters at issue, and will no doubt detail

the work allegedly performed on the stand, Defendants will point to the checks, claim that

payment has been made, and contend that Freydl deserves no more, or offered his services

gratuitously.  Such disputes underscore the inability of the Court to make a liability

determination as a matter of law.  *See Beatie v. City of New York*, 123 F.3d 707, 710-11 (2d Cir.

1997) ("When deciding a summary judgment motion, a trial court's function is not to weigh the

evidence, make credibility determinations or resolve issues of fact, but rather to determine

whether, drawing all reasonable inferences from the evidence presented in favor of the non-

moving party, a fair-minded jury could find in the non-moving party's favor. Where the evidence

in the record could reasonably support a verdict in the non-moving party's favor, summary

judgment is improper." (internal citations omitted)).

Accordingly, summary judgment with respect to Freydl's quasi-contract claims is denied,

except as to the *Graffagnino* matter.

**B.      Motion for Judgment on the Pleadings**

Defendants' Amended Counterclaim asserts that with respect to the *Brooks* and *Lucente*

matters, Freydl, through his corporation F&A, was paid an advance sum of $70,000.00, for work

that he never performed.  (*See* Amended Counterclaim, Dkt. No. 134, at ¶¶ 30-49.)  Defendants,

alleging unjust enrichment, claim that since "F&A retained all monies paid in advance by M&A

with respect to the *Brooks* and *Lucente* matters, and because neither F&A, nor Freydl, F&A's

alter ego, completed the associated work, F&A and Freydl were enriched at Counterclaimants'

expense."  (*Id.* at ¶ 51.)  Freydl moves to dismiss the counterclaim under Federal Rule of Civil

Procedure 12(c), alleging that where there is an adequate remedy at law, a party may not

22

properly assert a claim in equity, such as unjust enrichment.  (*See generally* Memorandum of

Law in Support of Judgment on the Pleadings, Dkt. No. 153 ("Pl.'s Mem.").)

 As discussed *supra*, claims sounding in quantum meruit or quasi-contract require good

faith performance on the part of the Plaintiff, acceptance by the Defendant, the expectation of

payment, and the reasonable value of the services.  *Landcom*, 259 A.D.2d at 968; *accord Beth*

*Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d

Cir. 2006) ("Cases dealing with unjust enrichment in New York are uniform in their recognition

of three elements of the claim: To prevail on a claim for unjust enrichment in New York, a

plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3)

that equity and good conscience require restitution." (internal quotations omitted)).  Here, "[t]he

principle cited by defendants, *viz.*, that unjust enrichment is unavailable where there is an

adequate remedy at law, reflects the legal distinction between unjust enrichment, or 'quasi-

contract,' claims and claims for damages resulting from a breach of contract."  *Friedman v.*

*Wahrsager*, 848 F. Supp. 2d 278, 294 (E.D.N.Y. 2012).  As a general rule, "[t]he existence of a

valid and enforceable written contract governing a particular subject matter ordinarily precludes

recovery in quasi contract for events arising out of the same subject matter."  *Clark-Fitzpatrick,*

*Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 387, 521 N.Y.S.2d 653 (Ct. App. 1987).  In other

words, "[a] 'quasi contract' only applies in the absence of an express agreement, and is not really

a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust

enrichment."  *Id; accord Beth Israel*, 448 F.3d 573, 586 (2d Cir. 2006) ("It is important to note,

however, the nature of an unjust enrichment claim in New York: 'The theory of unjust

enrichment lies as a quasi-contract claim.  It is an obligation the law creates *in the absence of any*

*agreement.*'" (quoting *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572, 841 N.E.2d

742 (Ct. App. 2005)).

    Here, it is true that Defendants do not plead the existence of a contract in addition to their

unjust enrichment claim; to do so, however, would be illogical given the premise of Defendants'

motion for summary judgment and original answer: namely, that there never was a contract

between M&A and Freydl, and that all monies paid out to Freydl were based on Meringolo's

sole discretion.  (Def.'s Opp. at 10.)  Additionally, it is true that Defendants seek only a

monetary remedy.  *See, e.g.*, *Friedman*, 848 F. Supp. at 294 ("Defendants argue that equitable

claims, such as unjust enrichment, are 'unavailable where an adequate remedy at law exists,'

noting that plaintiff's claim here, 'seeks only monetary relief, revealing that there is an adequate

remedy at law.'  This argument, however, erroneously conflates the cause of action with the

relief sought by plaintiff." (internal citation omitted)).  In sum, the fact that Defendants assert

monetary damages does not automatically convert their claim into one that possesses an adequate

remedy at law.  *See id.* at 295 ("The problem with defendants' argument is that it suggests that an

adequate legal remedy exists not because there is a contract involved, but because plaintiff seeks

monetary damages.").  Additionally, parties are "not barred, as [Plaintiff] suggest[s], from

bringing an unjust enrichment claim that seeks only monetary damages.  Stated differently,

unjust enrichment actions are not necessarily purely equitable claims."  *Id.*  At bottom, "claims

for unjust enrichment where an award of money would fairly compensate the party bringing the

claim" constitute claims that are "legal in nature."  *Miller v. Epstein*, 293 A.D.2d 282, 282, 742

N.Y.S.2d 191 (1st Dep't 2002).

    Thus, so long as Defendants have stated a claim for unjust enrichment under New York

law, their counterclaim survives Plaintiff's Rule 12(c) motion.  The Court agrees with

Defendants that the counterclaim adequately states a claim for unjust enrichment.  Defendants have alleged "(1) that Freydl . . . was enriched (2) at Counterclaimants' expense, and (3) that it is against equity and good conscience to permit Freydl to retain the monies sought to be recovered."  (Def.'s Opp. at 5.)  Moreover, Defendants have fleshed out their counterclaims with various factual details, including payments totaling approximately $70,000.00, which, Defendants allege, Freydl retained without performing the promised work.  Given the pleading standard under Rule 12(c), it is not sufficient to defeat such a claim to deny the allegations, as Freydl has done here.  For the *sine qua non* of an adequate pleading is not the *veracity* of the allegations, but rather, their *plausibility*.

Accordingly, Freydl's motion for judgment on the pleadings is denied, and Defendants' counterclaim for unjust enrichment remains.

## III.    Conclusion

The shifting details of contractual liability and the convoluted paper record in this case raise questions about Plaintiff's claims and Defendants' counterclaim.  Those questions are compounded by the parties' informal working relationship, with arrangements apparently made on an ad hoc, oral basis, and payments made without any specification of precisely what work they were intended to compensate.  But these questions ultimately go to credibility.  It is perhaps difficult to conclude on this record that a reasonable jury could find contractual liability (or quasi-contractual liability)—difficult, but not impossible.  Oral agreements are binding in these circumstances.  Whether Plaintiff can establish that he was short-changed by Defendant is ultimately a question for the factfinder.

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  All of Plaintiff's claims as against individual defendant John

Meringolo are dismissed.  Plaintiff's claims based on the *Galasso* and *Graffagnino* matters are dismissed.  In all other respects, Defendants' motion for summary judgment is denied.

Plaintiff's motion for judgment on the pleadings with respect to Defendants' counterclaim is DENIED.

The Clerk of Court is directed to close the motions at docket entry numbers 145 and 152.


SO ORDERED.

Dated:  New York, New York
        March 29, 2013

_____
J. PAUL OETKEN
United States District Judge